and that will be Mr. Aguinaldo and Mr. Kregel. I'll give you a minute to get yourselves logged in. Okay, good. It looks like we've got everybody, so I believe Mr. Aguinaldo, you are the first one up. Thank you, Your Honor, and may it please the court, Benjamin Aguinaldo on behalf of the appellant, Luis Villavicencio-Serna. When Chief Judge Paul Meyer granted a COA, she described the evidence in this case, or the lack thereof, as troubling. Now, she said that even without the benefit of the actual exhibits that were admitted at trial. And as our papers indicate, those exhibits reveal even deeper flaws. And so our position here is that the state's evidence at the end of the day was not just troubling, it was inadequate under Jackson. And the way we know that is that to convict Luis of first-degree murder, the jury had to find two separate propositions beyond a reasonable doubt. First, that Luis committed the act that caused Armando's death. And second, that when Luis did so, he had the requisite scientia. Now, we think that the most efficient way to resolve this case is to hold that no rational trier or fad could have held beyond a reasonable doubt that Luis had the requisite scientia. Why aren't you just asking us to reweigh the evidence here? Your Honor, I think we're not, because, I mean, I guess I'd ask the court to take Jackson at his word and to take this court's decision last year in the United States v. Garcia at its word. And I'm sorry, this is not in the briefs. That's at 9-19-F-39, which is that under Jackson, the court has to ask about the actual quantum or quality of proof necessary to prove a liability in a particular case. And in this case, what we've teed up for the court on direct review in the state courts and now in federal habeas proceedings is that the reliability of the state's evidence at the end of the day was subpar for due process purposes under Jackson. If each of the witnesses who testified or who gave statements and then recanted them, if each of them had testified at the trial and not recanted his or her statement, would that evidence have been sufficient to convict him beyond a reasonable doubt? I don't think so, Your Honor, and I think what the court would have to do is take a look at the last statements each of them gave to the police. And if you assume that those were given on the witness stands and those were the only statements given, I mean, take Daddio's statement, for example, his account of the events. His statement to the police was that the whole thing started that night when he got a call around midnight from Luis. And we know that that is just false because we have Daddio's phone records which show that he never received a call. But it's corroborated by what the other said. So again, why isn't that just a weight issue for the jury that we cannot reweigh on habeas? Well, Your Honor, I think what this court recognized in Samuel versus Frank, and that was a case where there was an issue of a court possibly coerced witness statement that was being assessed under the due process analysis. I think what this court has recognized is that even when evidence is admitted at trial and the jury is allowed to consider that evidence, the evidence may be of such deficient evidentiary value that no rational trier of fact could base a verdict beyond a reasonable doubt on that. And I think that's when Samuel, when this court, both in the majority opinion and in Judge Roedner's concurrence, focused extensively on the reliability of the evidence, both writing- But the problem seems to me to be, excuse me, that you're relying heavily on kind of the back and forth. You go through the inconsistencies in Josefina's story, but it's by no means uncommon for juries in criminal cases to see witnesses who are impeached, witnesses who are inconsistent. And we let the jury decide what they want to decide. And actually, there's some evidence, for example, Rogers trying to proffer an alibi based on his girlfriend, and the girlfriend doesn't support the alibi. It's not an un-messy transcript by any means, and I can easily imagine how the jury might have ruled the other way, but was it so far out of bounds to credit who they credited, to discredit who they must have discredited, that we've met the Jackson versus Virginia standard? I think so, Your Honor, and if I could just give you two responses to that. I mean, I think one is, if you look at pages 27 and 28 of our reply brief, we lay out, also in footnote 8, a number of cases where even in Illinois, courts routinely recognize that when the state's case comes down to core testimony that itself has been rendered unreliable because of the many statements that the person giving that testimony has given in the past, that those are often cases where a conviction should be vacated. But that might be on direct appeal. But again, we're here on habeas, which is different. That's right, Your Honor. I mean, I think that's absolutely true, and this court has recognized in cases like Piaskowski that even despite the dual layers of deference on AEDPA review, the cases that govern how you analyze a Jackson analysis don't kind of drop out of the analysis. You still run the analysis, and this court only dedicated a paragraph at the end of Piaskowski to the objectively unreasonable part of the AEDPA analysis and said— You don't have a gapping hole here. You have credibility issues, and as Judge Wood indicated, the jury could have gone either way, but it seems that you're just asking us to reweigh the credibility here. Your Honor, I think the way to think about that is to just take any one of these three witnesses' statements to the police. So if you take just Daddio's statement and his account of the events that night at the end to the police was that he heard a guy yell, he heard gunshots, he heard Luis yell, nothing more. I'm not sure how a jury looking at that statement could— But you can't just look at one statement. You have to look at everything and piece it together. Absolutely, Your Honor. I completely agree with that, and I think try to piece them together. I mean, if you look at Daddio's statement or Roger's statement alongside that, his statement was basically that he heard a guy yell, he heard Luis yell, he heard gunshots. Those two together, I don't see, especially for purposes of scientia, how a rational trier of fact could say, oh, we know from those statements that he intentionally aimed and fired a gun at Armando. And so if you think—if you agree with me at least that far with those two statements, then all you have is Josefina, who's given numerous statements to the police, who testified under oath shortly after her police interrogation that she wasn't involved and that Luis wasn't involved, and then who, of course, gave a different statement at trial. But in terms of scientia, she offers some motive, some jealousy between Luis and Armando, which a jury might say something like that led to the encounter. Why aim at Armando Huerta as opposed to anybody else in the world? Well, Josefina offers a reason. I think that's perfectly fine, Your Honor, in a case where the standard—the burden of proof is preponderance of the evidence. I think you could absolutely ask, is it more likely than not that he may have aimed and fired a gun at Armando? But, of course, this is not the burden that the state had at trial in this case. And when Jackson says that the trial of fact had to reach a state of near certitude that Luis intentionally aimed and fired a gun at Armando— On that point, does it make a difference that there were five wounds at short range? So, Your Honor, what the record reflects is that there were five shell casings that were recovered, only two bullets that hit Armando. There's no evidence in the record what, if anything, happened to the other three bullets. I mean, I would agree if, you know, 100 shots were fired and 100 all landed in the victim's body, that's definitely a strong case for scientia. I think here you could easily say that, if you just assume for the sake of argument, assume that Luis recklessly tried to scare Armando and accidentally hit him. I mean, that's—there's nothing in the record that disproves that hypothetical. And I think that explains why just assuming that Luis was angry about a phone call from a week earlier is not sufficient to prove obscientia in this case. And I see my time has almost expired. If I could reserve the remainder for rebuttal. Sure, that would be fine. Mr. Kriegel. Good afternoon, Your Honors, and may it please the court, counsel. I'm Assistant Attorney General Jason Kriegel for Respondent, and just a couple of points in response. First, on the question of Sienta, just to start with Illinois law, it was not necessary for the state to prove that Petitioner intended to kill Puerta. It was only necessary that the jury find that he knew his actions created a strong probability of great bodily harm. And we know, just looking at Vasquez's statement, that she said she pointed Puerta out to Petitioner, that Petitioner pointed the gun in Puerta's direction, and then there were multiple shots. And we know from the physical evidence that Puerta was hit twice. And so just from that, it's fair to us to infer that Petitioner was aiming in Puerta's direction, and that certainly would have created a strong probability of great bodily harm. On top of that, as Judge Wood pointed out, was the motive evidence, multiple statements from Petitioner about animus towards Puerta. A week before this event, he threatened that he would shoot Puerta, and so the jury could infer that he was following through on that threat. The second point is on the reliability of the videotaped statements generally. The jury could certainly have rationally credited the statements that were given to police a short time after this shooting for a number of reasons. First, there are three statements, and so they corroborate each other, and they agree on the fundamental facts, even though I must concede there were inconsistencies. None of those inconsistencies were material to the elements of the crime. All three agreed that Petitioner had a gun. He directed them to Vasquez's apartment, and that he fired, and that the shots were fired. But we don't know which side of the car, and there are all sorts of—not to mention whether the car was the dark green. I mean, I don't see, even in bad light, how you would confuse dark green and a silver color. Sure. Well, the testimony was that Rojas was drunk at the time, and they were standing sort of behind two parked cars, so he only saw the car pass by quickly and saw presumably the side of the car that Petitioner was leaning out of. So, I mean, it's true there were inconsistencies and there were issues, but these were all facts that were before the jury. These were arguments that Petitioner made in closing and that the jury could weigh, and they also had to weigh the recantations that were given at trial, which were simply incredible. I mean, there were several police officers who testified that all three witnesses came to the station voluntarily. There was no coercion, no promises, no threats. The jury was entitled to believe that testimony, and I think, as Judge Wood pointed out, Rojas' alibi just fell apart completely, and the other two had no alibi at all. So, it was fair for the jury to credit those original statements over their trial testimony. I'd be happy to answer any other questions the Court has, but if not, I would ask that the Court affirm the denial of habeas relief. All right. I don't see any questions, so thank you very much. Anything final to say, Mr. Aguinalda? Thank you, Your Honor. Your Honor, just one very brief point in the rebuttal. So, my friend on the other side referred to the Court, Josephina's statement to the police that she pointed out where to— I encourage the Court to go look at that video, if it hasn't already, because I think that's a great example of the leading questions that really prompted each of these police interrogations, because that was an instance where the police asked her, did you point out Armando to him, and did you say anything? And there's a pause when she doesn't answer, and the police officer says, you remember now, did you say anything when you pointed him out to Luis? I think that's a great example of the leading questions that gave rise to all of these statements in the police interrogations, and as we lay out in our opening brief, that's one of the many indicia of unreliability that is insufficient for Jackson purposes. So, for all of those reasons, we would ask the Court to reverse the District Court's judgment. All right. Thank you very much, and I believe you and your firm were serving pro bono on this case. Is that correct? That's correct, Your Honor. We appreciate your efforts on behalf of your client and also for the Court in general, and of course, thank you, Mr. Kegel, as well. So, the case will be taken under advisement.